**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |
|---|---|
| FRANCIS E. PARKER MEMORIAL HOME, INC., on behalf of itself and all others similarly situated, | |
| Plaintiff, | Civ. No. 2:12-cv-02441 (ES) |
| v. | **O P I N I O N** |
| GEORGIA-PACIFIC LLC and GEORGIA-PACIFIC WOOD PRODUCTS LLC, | |
| Defendants. | |

---

*Appearances by:*

PARKER WAICHMAN LLP Jessica E. Vertullo
    Melanie H. Muhlstock
    6 Harbor Park Drive
    Port Washington, NY 11050

    Jordan L. Chaikin (admitted *Pro Hac Vice*)
    3301 Bonita Beach Rd, Suite 101
    Bonita Springs, FL 34134

WHITFIELD BRYSON & MASON, LLP
    Gary E. Mason (*Pro Hac Vice* admission pending)
    Nicholas A. Migliaccio (*Pro Hac Vice* admission pending)
    Jason S. Rathod (*Pro Hac Vice* admission pending)
    1625 Massachusetts Avenue, NW
    Suite 605
    Washington, DC 20036

    Daniel K. Bryson (admitted *Pro Hac Vice*)
    Scott C. Harris (admitted *Pro Hac Vice*)

900 W. Morgan Street
Raleigh, NC 27603

BLOCK, CROUCH, KEETER, BEHM & SAYED, LLP
Auley M. Crouch, III (admitted *Pro Hac Vice*)
Christopher K. Behm (admitted *Pro Hac Vice*)
PO Box 4
Wilmington, NC 28402

RHINE LAW FIRM, P.C.
Joel R. Rhime (admitted *Pro Hac Vice*)
Jean Martin (admitted *Pro Hac Vice*)
314 Walnut Street
Suite 1000
Wilmington, NC 28401

     *Attorneys for Plaintiff,*

PORZIO, BROMBERG & NEWMAN P.C.
John Chester
Roy Alan Cohen
Steven P. Benenson
Heather Bryce Siegelheim
100 Southgate Parkway
Morristown, NJ 07962-1997

ROGER & HARDEN LLP
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601

     *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

     Presently before the Court is a motion to partially dismiss by Defendants Georgia-Pacific, LLC and Georgia-Pacific Woods Products, LLC (hereinafter collectively referred to as "Defendants" and/or "GP") three counts of a consumer class action Amended Complaint pursuant to Fed. R. Civ. P. 12(b) (6). The instant motion arises out of an Amended Complaint filed by Plaintiff Francis E. Parker Memorial Home, Inc. (hereinafter "Parker") on behalf of itself and a putative class alleging violations of the New Jersey Products Liability Act, N.J.S.A.

2A:58C-1 *et seq.* ("PLA"); breach of express warranty; and the New Jersey Consumer Fraud

Act, N.J.S.A. 56:8-1 *et seq.* ("CFA"). Parker generally alleges that GP misrepresented the

quality of its products, thereby causing fraud and tort-based harm, and that Parker and the

putative class have suffered damages as a result thereof. Parker has not yet moved to certify the

class. The Court is confronted with a motion to partially dismiss the Amended Complaint with

respect to Count III for violation of the CFA and Count VI for declaratory relief. Additionally,

GP urges the Court to limit Count II to claims arising under the Thirty-Year Limited Warranty

and to dismiss claims with prejudice for breach of express warranty on any other basis. For the

reasons set forth below, GP's motion is DENIED in part and GRANTED in part.

## I.  BACKGROUND

The facts here are provided to the extent relevant to the present motion, and all

reasonable inferences are drawn in favor of Parker pursuant to the proper standard of review on a

motion to dismiss. See Morse v. Lower Merion Sch. Dist., *infra*, 132 F.3d 902, 906 (3d Cir.

1997).

Parker constructed a large assisted living facility in Highland Park, New Jersey, using an

exterior trim ("PrimeTrim") designed, manufactured, warranted, advertised, and sold by GP.

Parker brings a consumer class action on behalf of itself and all persons and entities in New

Jersey who own a home or other structure on which Georgia-Pacific PrimTrim exterior trim is

installed.

Generally, Parker alleges that despite GP's representations via marketing, express

warranty, and instructions, PrimeTrim prematurely deteriorates, rots, swells, buckles,

delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor

exposure; causes consequential water and structural damages; and promotes the growth of mold,

mildew, fungi, and insect infestation in the structures in which it is installed. Parker contends that design and construction defects reduced the effectiveness and performance of the PrimeTrim and rendered it unable to perform the ordinary purposes for which it was marketed and used.

Parker further contends that GP knew, as early as 1998, that PrimeTrim had a history of failures and was capable of rot, and knew that the PrimeTrim required more exacting installation than standard construction norms, yet failed and/or omitted to inform its distributors, customers, and eventual owners of the product of these issues and potential remedies or care instructions for these deficiencies. The allegations include multiple internal acknowledgements by GP by technical personnel and senior sales personnel that the broadly-prescribed uses could "mislead" applicators of the product as to its quality, and that product complaints were expected to increase. (Am. Compl. ¶¶ 97-106.) For example, "PrimeTrim had only been on the market eleven (11) years by the year 2000, but GP personnel acknowledge internally that they fully anticipated that product complaints concerning PrimeTrim would increase as the product life increased toward 20 to 30 years." (Am. Compl. ¶ 101.)

Moreover, GP's test productions prior to the year 2000 revealed dramatic improvements to decay resistance using various percentages of zinc borate, with no significant corresponding decrease in weatherability properties of the resulting product. (Am. Compl. ¶ 102.) By the year 2000, some of GP's competitors in the composite exterior trim market had already successfully incorporated zinc borate into their products and introduced same on the market to the public. (Am. Compl.¶ 103.) Parker submits upon information and belief that "a proposal from the GP plant that produced PrimeTrim was submitted internally to Georgia-Pacific management in the year 2000 seeking approval to incorporate zinc borate into actual production of all products produced at the plant, ,at [sic] an estimated annual cost less than $1 Million Dollars.

Alternatively, the proposal indicated that zinc borate could be added only to production of PRimeTrim, due to Prime Trim's increased susceptibility to rotting complaints, at even less cost. However, upon information and belief, Georgia-Pacific's management rejected both proposals due to cost." (Am. Compl.¶ 104.) Parker submits that GP plant personnel again provided a revised written justification seeking authority from GP management to incorporate zinc borate into actual production of PrimeTrim in 2002, at less of the cost originally estimated in 2000, however management once again refused the 2002 proposal due to estimated cost. (Am. Compl.¶ 105.) Zinc borate was never added to PrimeTrim during the remaining four years that it remained on the market. (Am. Compl.¶ 106.)

Parker also takes issue with GP's failure to test the thicker versions of PrimeTrim which were later manufactured, marketed and sold, and failure to test in actual installations around windows and doors, although it later expressly marketed the product for use as windowtrim though it is well-known within the construction industry the propensity for windows to leak.

Parker contends that GP falsely marketed, advertised, and marketed the quality and durability of the product. For example, representations made in marketing materials and advertisements included that PrimeTrim: "offers up to four times more decay resistance than lumber[;]" "outperformed lumber through two years of direct exposure to sun, rain, and snow[;]" is "more durable than traditional lumber[;]" has "more than fifteen years with a track record of proven performance[;]" has "virtually no waste due to material defects[;]" "looks great for years without frequent repainting, helping homeowners save money or maintenance[;]" is "[e]ngineered to withstand sun, rain, snow and time[;]" "surpasses premium lumber trim in both durability and finish[;]" "[f]eatures superior moisture and decay resistance[;]" was "proven in

over four years of laboratory and field testing[;]" and was "a perfect trim product." (Am. Compl. ¶¶ 35; 95)

GP also expressly warranted that the PrimeTrim was appropriate for its intended uses and could be used "wherever non-structural wood trim can be used"; "anywhere defect-free, non-structural trim lumber is required"; "where any high-quality non-structural trim lumber is required"; and "is free of defects in materials and workmanship." (Am. Compl. ¶ 76.) GP's warranty covered a thirty year period from the date of the original installation and guaranteed that PrimeTrim would not: "Crack, chip, split, or delaminate in a manner that would render the trim materially unable to perform its function; Buckle, shrink or swell in a manner that materially affects its appearance." (Am. Compl., Ex. A.) GP also warranted that the factory-applied primed coat would not peel, crack or blister from the substrate for a period of eight years after the date of installation. (Id.) However, the warranty did not cover liability for damages to other material to which PrimeTrim is affixed. Additionally, in order to remedy any defect in the PrimeTrim, by its sole discretion, GP warranted compensation by either repair or replacement, or cash payments equivalent to the reasonable cost of repair or replacement, provided that the "reasonable cost" of repair or replacement would not exceed two times the original GP sales price of the affected trim.

On or about July 14, 2011, Parker made a warranty claim under the express warranty for replacement of the PrimeTrim on its Structure(s). Parker presented its warranty claim using the Warranty Claim Form provided. The following September, GP inspected Parker's structures to investigate the warranty claim, but denied the claim when it discovered that the product was misinstalled. Parker alleges that the limitations of damages contained in the express warranty are

harsh, oppressive, and one-sided, and render remedies available and the manner of dispute resolution unconscionable.

Additionally, Parker maintains that GP failed to provide adequate instructions for the installation of the PrimeTrim, including how to seal and to prime site-cut ends of PrimeTrim, when GP knew that the PrimeTrim would be cut to size on site. The installation instructions further provided that "PrimeTrim may be installed wherever non-structural wood trim can be used"; and "PrimeTrim is intended for use as fascia, rake board, corner board, shingle mould, bandboard, baseboard, soffit, or anywhere defect-free, non-structural trim lumber is required." (Am. Compl.¶ 47.)

Parker brings this class action on behalf of itself and all others similarly situated, with the Class defined as:

DAMAGES CLASS:

All individuals and entities in the State of New Jersey that have owned, own, or acquired homes, residences, buildings, or other structures physically located in the State of New Jersey on which GP's PrimeTrim is or has been installed.

ECONOMIC LOSS DAMAGES SUBCLASS:

All individuals and entities in the State of New Jersey that have owned, own, or acquired homes, residences, buildings, or other structures physically located in the State of New Jersey on which GP's PrimeTrim is or has been installed and in which GP's PrimeTrim has been damaged but the other property adjacent to GP's PrimeTrim has not been damaged.

DECLARATORY RELIEF CLASS:

All persons and entities that own a structure located within the State of New Jersey in which GP's PrimeTrim is installed on the exterior.

(Am. Compl. ¶ 17.)[1]

      With regard to the Economic Loss Damages Subclass, Parker specifies:

> 24. Upon information and belief, the typical failure mode of
> PrimeTrim begins with the product only damaging itself, often in
> indiscernable or nearly indiscernable methods, but then eventually
> progresses, often unnoticed to the untrained eye, by failing to such
> a degree that it begins to also cause damage to other building
> products installed nearby the PrimeTrim on a structure.
>
> 25. As a result, upon information and belief, an ascertainable
> subset of the class has suffered economic losses, but has not
> suffered personal injury or damage to other property, as a result of
> Defendants' conduct.
>
> 26. Because this subset has suffered economic losses, but not
> personal injury or damage to other property, the claims they are
> entitled to bring vary from those of the class as a whole.
> Specifically, they are entitled to bring claims under the New Jersey
> Consumer Fraud Act, but not claims under the New Jersey Product
> Liability Act, which addresses only "product liability actions"
> defined to exclude claims when economic losses, and not personal
> injury or damage to other property, are at stake.

(Am. Compl. at 8.)

      The Amended Complaint sets forth four counts: (1) strict products liability – design

defect, manufacturing defect, and failure to warn pursuant to the New Jersey Products Liability

Act, N.J.S.A. 2A:58C-1 *et seq.* ("PLA"); (2) breach of express warranty; (3) violation of the

New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* ("CFA"), only on behalf of the

Economic Loss Damages Subclass, based on representations made within the express warranty;

(4) Declaratory Relief via a ruling that: a) the PrimeTrim has a defect which results in premature

failure; b) Defendants' warranty fails on its essential purpose; c) Certain provisions of

---

[1]     Excluded from the Class are: (a) any Judge or Magistrate presiding over this
action and members of their families; (b) GP and any entity in which GP has a controlling
interest or which has a controlling interest in GP and its legal representatives, assigns and
successors of GP; and (c) all persons who properly execute and file a timely request for
exclusion from the Class. (Id.)

Defendants' warranty are void as unconscionable; d) Defendants must notify owners of the defect; e) Defendants will reassess all prior warranty claims and pay the full costs of repairs and damages; and f) Defendants will pay the costs of inspection to determine whether any Class member's PrimeTrim needs replacement. Parker prays for class relief for compensatory damages, equitable and/or injunctive relief, specific performance of the express warranty, payments of costs of suit, pre and post-judgment interest, reasonable attorneys' and expert fees, and for such other relief deemed just and proper.

The Complaint was filed on April 25, 2012, and the Amended Complaint [Doc. 30] was filed on July 9, 2012. Parker has yet to move for class certification of its claims. The motion to dismiss considered below was subsequently filed on July 23, 2012 before The Honorable Esther Salas. The motion was referred on January 22, 2013. On May 6, 2013, the Court heard oral argument.

Considered today is a motion to partially dismiss: 1) Count III for violation of the Consumer Fraud Act due to subsumption of the claim by the Products Liability Act, lack of standing to assert the CFA claim, and failure to meet the pleading standards; 2) Count VI based on the lack of availability of declaratory relief; and 3) Count II to limit claims for breach of express warranty provided for any basis other than the Thirty-Year Limited Warranty that covers PrimeTrim. The issues presented are outlined and discussed in turn below.

## II. DISCUSSION

### A. Standard of Review

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading that states a claim for relief need only contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." To the extent that claims sound in fraud or misrepresentation, they "must state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b).

In deciding a motion to dismiss, the Court must look to the face of the complaint and decide, taking all of the allegations of the fact as true and construing them in a light most favorable to the plaintiff, whether the Amended Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Only the allegations in the Amended Complaint; matters of public record, orders, and exhibits attached to the Amended Complaint are taken into consideration. Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F. 2d 808, 812 (3d Cir. 1990).

A plaintiff is obligated to "prove the 'grounds' of his 'entitle[ment] to relief," which requires more than "labels and conclusions," but he is not required to lay out "detailed factual allegations," Twombly, 550 U.S. at 555 (internal reference omitted), except to the extent required here by Fed. R. Civ. P. 9(b). A complaint must contain facially plausible claims, that is, a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Twombly, 550 U.S. at 556. This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Fowler, 578 F.3d at 211 (internal citation omitted). The Court's inquiry, however, "is not whether the plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

When a claim is dismissed pursuant to Fed. R. Civ. P. 12(b)(6), leave to amend and reassert that claim is ordinarily granted. In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). A claim may be dismissed with prejudice, however, if amending the complaint would be futile. Id. ""Futile," as used in this context, means that the complaint could not be amended to state a legally-cognizable claim. Id. (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).

## B. Analysis

### 1. The Consumer Fraud Act (Count III)

#### a. The CFA and the PLA are not irreconcilable here and therefore the CFA claim is not subsumed.

The first issue addressed is whether the CFA claim raised by the Economic Damages Subclass, which is comprised of purchasers of PrimeTrim who have only experienced damage to the product itself and not its supporting materials, is subsumed by the PLA.

"'The Consumer Fraud Act, originally enacted in 1960, is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate.'" Lyle Real v. Radir Wheels Inc., 198 N.J. 511 (2009) (quoting Daaelman v. Elizabethtown Gas Co., 77 N.J. 267, 270 (1978). "It is designed to address 'sharp practices and dealings in the market of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive, or other similar kind of selling or advertising practices.'" Id. (quoting Daaelman, 77 N.J. at 271).

> [The CFA] has three main purposes: to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages; and, by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual.

<u>Lettenmaier v. Lube Connection, Inc.</u>, 162 N.J. 136, 139 (1999) (internal citations omitted).

Specifically, the CFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]" N.J.S.A. § 56:8-2. Private parties must prove that they suffered an "ascertainable loss of moneys or property" as a result of the unlawful practice. N.J.S.A. § 56:8-19. If successful, they can recover treble damages and reasonable attorneys' fees. <u>Id.</u> Damages under the Act are limited to "ascertainable loss" and encompass only economic losses. <u>Gennari v. Weichert Co. Realtors</u>, 148 N.J. 582, 612-13 (1997). The CFA further provides that "[t]he rights, remedies, and prohibitions accorded by [its] provisions" are "to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of [New Jersey], and nothing contained herein shall be construed to deny, abrogate or impair any such common law or statutory right, remedy or prohibition." N.J.S.A. § 56:8-2.13.

While economic losses due to harm to the product itself are recoverable under the CFA, the PLA explicitly exempts such losses in its definition of harm, which allows for "physical damage to property, other than to the product itself." N.J.S.A. § 2A:58C-1(b)(2)(a).[2]

---

[2]    In full, "harm" is defined in the PLA as:

      (a) Physical damage to property, other than to the product itself;
      (b) personal physical illness, injury or death; (c) pain and suffering,
      mental anguish or emotional harm; and (d) any loss of consortium

A product liability action is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1b(3). "The language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products." In re Lead Paint Litig., 191 N.J. 405, 436-47 (2007). The "classic articulation of tort law duties, that is, to warn or to make safe, is squarely within the theories included in the PLA. *See N.J.S.A.* 2A:58C-2." Id. [3]

The Third Circuit Court of Appeals examined the question of subsumption where an estate sought damages from Ford Motor Company based on failure-to-warn and design-defect claims under the PLA and an additional claim under the CFA for unconscionable consumer practices. See Estate of Edward W. Knoster v. Ford Motor Co., 200 Fed. Appx. 106 (3d Cir. 2006). The federal appeals court reversed the District Court of New Jersey's conclusion that the PLA subsumed the CFA claim. The appeals court reasoned that "no overlap" was found between the claims. Specifically, the Knosters sought "only economic damages resulting from

---

or services or other loss deriving from any type of harm described
in subparagraphs (a) through (c) of this paragraph.

N.J.S.A. § 2A:58C-1b(2).

[3]     N.J.S.A. § 2A:58C-2 (Liability of manufacturer or seller in product liability action)
provides:

A manufacturer or seller of a product shall be liable in a product
liability action only if the claimant proves by a preponderance of
the evidence that the product causing the harm was not reasonably
fit, suitable or safe for its intended purpose because it: a. deviated
from the design specifications, formulae, or performance standards
of the manufacturer or from otherwise identical units manufactured
to the same manufacturing specifications or formulae, or b. failed
to contain adequate warnings or instructions, or c. was designed in
a defective manner.

the harm to the Taurus itself. The PLA excludes those damages from its definition of 'harm,' so the Knoster's CFA claim was not a 'product liability action.' See *N.J.S.A. § 58C-1(b)(2), (3)*." Id. at 116.

Knoster further explained the significance of the damages sought in its decision to allow the CFA claim to see the light of day:

> That critical fact readily distinguishes the two District Court decisions cited by Ford. In Walus v. Pfizer, Inc., 812 F. Supp. 41 (D.N.J. 1993), the plaintiff sued Pfizer based on his worry that a normally functioning heart valve might fail at some future time. Id. at 42-43. The plaintiff sought to recover for his emotional distress, not harm to the product itself. Id. at 44. In Brown v. Philip Morris, Inc., 228 F. Supp. 2d 506 (D.N.J. 2002), the fraud claim involved physical injuries caused by cigarettes, not harm to cigarettes. Id. at 517. Unlike those claims, the Knosters seek only to recover for harm to the Taurus, and the PLA does not cover those damages. ***The PLA cannot subsume that which it explicitly excludes from its coverage.*** We will therefore reverse the District Court's judgment as to the CFA claim.

Id. (emphasis added).

The New Jersey Supreme Court recently advised that "[a]lthough intentionally broad, the reach of the CFA is not without boundaries." Lyle Real v. Radir Wheels, Inc., 198 N.J. 511, 522-23 (2009) (unanimous). "When determining whether activity presumptively within the ambit of the CFA nevertheless is exempt from its reach, the governing precept" is as follows:

> "In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied ... that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. *We stress that the conflict must be patent and sharp, and must not simply constitute amere possibility of incompatibility.* If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial

measures may be rendered impotent as primary weapons in
[combating] clear forms of fraud simply because those fraudulent
practices happen also to be covered by some other statute or
regulation."

[ ]

This context requires the recognition that, "[i]n the modern
administrative state, regulation is frequently complementary,
overlapping, and comprehensive."

Id. (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 270 (1997) (emphasis

added).

"The measured application of those principles has lead to few, very limited exceptions to

the CPA's reach." Id. (referencing Daaleman, 77 N.J .at 272-73).

We have recognized the tension inherent in those circumstances.
Id. at 271, 696 A.2d 546. ("Absent a nearly irreconcilable conflict,
to allow one remedial statute to preempt another or to co-opt a
broad field of regulatory concern, simply because the two statutes
regulate the same activity, would defeat the purposes giving rise to
the need for regulation."). For that reason, "[i]t is not readily to be
inferred that the Legislature, by enacting multiple remedial statutes
designed to augment protection, actually intended that parties be
subject only to one source of regulation." Ibid.

Id. (quoting Daaleman, 77 N.J. at 271.

In the same vein, the CFA and PLA claims brought here are not incompatible, at least not

at the current stage of review while discovery is ongoing. Both classes may be related but are

distinct, and it is not yet certain the factual degree to which consumers have experienced damage

to the PrimeTrim but not to adjacent materials. In oral argument on this motion, GP argued that

the CFA claim is subsumed by the PLA claim because the damage to the PrimeTrim will

*eventually* cause rot to the adjacent structures to which it is affixed. GP went to length to point

out sections of the Amended Complaint where Parker foreshadows the future risk which the

subclass faces. Indeed, were damage to a class member's PrimeTrim to spread to adjacent property, the claims may arguably be in direct conflict.

However, there is no indication that the Legislature intended to foreclose today's fraud-based remedies by providing a remedy for a tort-based harm which may or may not materialize in the future. If that were the case, then individuals who purchased the product based on representations of its quality, but who have not yet experienced harm to adjacent materials, would be foreclosed today from any contract or tort-based relief altogether, for they would have to sit on their rights and wait for the harm to spread to adjacent structures. It is foreseeable that this may bar of any relief altogether based on the facts due to complications of notice inquiry and the tolling of the statute of limitations.

In terms of the case at bar, the determination of the number of class members pursuing either claim may adjust as this case progresses, however this does not imply that a subset should be barred from today's damages at the expense of uncertain future damages. Had the Legislature intended for one statute to replace or limit the remedy available pursuant to the other statute, it could have done so. The PLA is not dispositive of claims involving consumer fraud, as the statutes relate to distinct harms and remedies and are not incompatible here.[4]

---

[4] See e.g., Audria Arlandson v. Hartz Mountain Corp, 792 F. Supp. 2d 691 (D.N.J. 2011) (differentiating the holding from Knoster because the allegations were based on harm caused to the pets by the defective product, and not based on any harm caused to the products themselves); Rehberger v. Honeywell, No. 11-0085, 2011 U.S. Dist. LEXIS 19616, at *9-10 (M.D. Te. Feb. 2011) ("[T]he relevant harm was the plaintiff's decision to purchase the [product], which was caused by the defendant's alleged misrepresentations and omissions, not by the product. Indeed, this harm occurred before the plaintiff ever operated the [product]. Because the plaintiff has not asserted any 'product liability' claims, his claims are not subsumed by the PLA."); Nafar v. Hollywood Tanning Systems, Inc., 06-3826, 2010 U.S. Dist. LEXIS 65183 (D.N.J. June 30, 2010) ("In short, to assess whether a plaintiff's claims sound in consumer fraud or products liability, courts should consider the 'essential nature' of the claims."); New Hope Pipe Liners, LLC v. Composites One, LLC, Civ. No. 09-3222, 2009 U.S. Dist. LEXIS 111217 (D.N.J. Nov. 30, 2009) ("Since representation-based harms are distinct from products liability-type harms, the PLA does not subsume those claims"); Alloway v. General Marine Industries, 149 N.J. 620, 641-

In oral argument, GP maintained that a decision reached by the New Jersey Supreme Court is "on all fours" with the issue considered today, <u>Sinclair v. Merck & Co., Inc.</u>, 195 N.J. 51 (2008). While <u>Sinclair</u> is certainly informative, it is not on point. <u>Sinclair</u> involved a national class challenge on behalf of users of the prescription drug Vioxx which was later revealed to increase the risk of serious cardiovascular events. Importantly, the plaintiffs "did not allege that they [ ] had an Electrocardiogram (EKG) since they began taking Vioxx, or that they [ ] suffered any known adverse effect as a result of taking Vioxx." <u>Id.</u> at 56. The question presented to the court was "whether the plaintiffs may seek to recover the costs of medical monitoring without an allegation of physical injury in a products liability case[.]" <u>Id.</u> at 58; <u>see also id.</u> at 62. The plaintiffs argued that the PLA should cover the cost of medical monitoring for potential future physical harm. The New Jersey Supreme Court examined clause (b) of the PLA's definition of "harm" regarding "personal physical illness, injury or death[,]" and concluded that because the PLA requires a physical injury, the plaintiffs could not recover for medical monitoring premature to such injury. N.J.S.A. § 2A:58C-1b(2)(b).

The plaintiffs in <u>Sinclair</u> also tried to "avoid the requirements of the PLA by asserting their claims as CFA claims." <u>Id.</u> at 65. However, the court noted that the Legislature "expressly provided in the PLA that claims for 'harm caused by a product' are governed by the PLA 'irrespective of the underlying the claim.' *N.J.S.A.* 2A:58C-1b(3)." <u>Id.</u> at 65-66. <u>Sinclair</u> explained that "[t]he heart of plaintiffs' case is the potential for harm caused by Merck's drug. It

---

42 (1997) ("Although the [PLA] excludes physical damage to the product itself from the definition of 'harm,' *N.J.S.A.* 2A:58C-1b(2), the Legislature did not intend to codify in the [PLA] all common-law remedies, *see Senate Judiciary Committee Statement*, Senate, No. 2805, L. 1987, c. 197. Consequently, the exclusion of physical damage from harm that falls within the PLA is not dispositive [for relief for harm to a product itself]. Additionally, the Legislature has adopted the Consumer Fraud Act, which provides generous protection to defrauded consumers.")

is obviously a product liability claim. Plaintiffs' CFA claim does not fall within an exception to the PLA, but rather clearly falls within its scope." Id.

Sinclair did not explore whether the request for preventative medical monitoring funds would fit within the definition of "ascertainable loss of moneys or property" by the CFA. See N.J.S.A. § 56:8-19. There is no discussion of subsumption, nor did there need to be. Harm to the product was not alleged. Indeed, Sinclair dedicated the majority of its discussion to the PLA because the nature of the tort-based product liability claim was clear: the challenge sought cost for monitoring future potential harm; plaintiffs explicitly did not seek compensation for EKGs paid out-of-pocket; harm to the product was not alleged whereas harm *by* the product was; and the facts did not set forth faulty advertisements. Moreover, Sinclair did not so much as refer to the Third Circuit Court of Appeals' decision in Knoster, although it was decided just two years earlier.

Knoster is on point here because the CFA and the PLA claims are not in direct conflict. The subclass only alleges damage to the PrimeTrim pursuant to the CFA, whereas different members of the class only allege damages for supporting materials, and not the PrimeTrim, pursuant to the PLA. There is no irreconcilable conflict between the statutes, and thus both claims may proceed, at least at this stage of review.[5]

_____

[5]      The Court's reasoning and conclusion is similar to that reached by United States District Court Judge Thompson:

> Traditional products liability claims arise out of the situation where a product fails to perform as would ordinarily be expected in the absence of any specific promises made by the seller or manufacturer. Representation-based claims, by contrast, deal with the situation where a product does not conform to specific representations made directly to the buyer. Since representation-based claims and products liability claims deal with two distinct categories of unlawful conduct rather than two different theories

### b. The attack on standing is premature.

GP argues that Parker lacks standing as a matter of law to assert the CFA claim on behalf of itself or the subclass because it has not suffered an injury-in-fact covered by the CFA. GP contends that "[c]ourts in this district have repeatedly dismissed for lack of standing claims brought by a would-be class representative on behalf of absent class members where the representative could not assert those claims on its own behalf." (MTD Br. at 12.) As Parker points out however, the cases on which GP relies are dissimilar because the plaintiffs therein did not so much as purchase or use the product alleged to cause class-based injury. Thus, these cases are clearly inapposite here. For example, in <u>Green v. Green Mountain Coffee Roasters, Inc.</u>, the Court reasoned that "Plaintiff does not have 'standing to pursue a claim that products [ ] he neither purchased nor used did not work as advertised.' Consequently, the Court will only consider Plaintiffs' allegations pertaining to the model series B70." 279 F.R.D. 275, 280 (D.N.J. Dec. 20, 2011) (internal citation omitted).[6] <u>See also</u> <u>Lieberson v. Johnson & Johnson Consumer Co.</u>, 865 F. Supp. 2d 529, 537 (D.N.J. Sept. 21, 2011) ("Because Plaintiff has not alleged that she purchased or used two of the four baby bath products at issue here, Plaintiff cannot establish an injury-in-fact with regard to those products.").

---

covering the same underlying conduct, the PLA does not subsume representation-based claims . . . Since representation-based harms are distinct from product liability-type harms, the PLA does not subsume those claims.

<u>New Hope Pipe Liners, LLC v. Composites One, LLC</u>, Civ. No. 09-3222, 2009 U.S. Dist. LEXIS 111217, *10 (Nov. 30, 2009).

[6]     <u>Green</u> is additionally instructive here, as the Court dismissed Mr. Green's CFA claim for failure to plead an ascertainable loss by "either out-of-pocket loss or a demonstration of loss in value[,]" because Mr. Green failed to avail himself of the warranty which would have repaired or replaced the defective brewer. 279 F.R.D. at 282 (internal citation and reference omitted). In contrast, Parker pursued the warranty option but it was denied.

The third case which GP looks to for support of its argument is similarly unconvincing. In <u>Koronthaly v. L'Oreal USA, Inc.</u>, No. 07-cv-5588, 2008 U.S. Dist. LEXIS 59024 (July 29, 2008), the plaintiff sought damages on behalf of herself and a putative class based on the existence of lead in lipstick. Ms. Koronthaly did not allege, however, that the lead levels caused any actual physical injury. Thus, the Court concluded that "Plaintiff cannot seek a remedy for a harm that she has not actually or allegedly suffered." Regarding her CFA claim, the Court noted that Ms. Koronthaly "has not provided any specific facts to support her CFA claim." <u>Id.</u> at 16.

Here, Parker alleges that it suffered harm as a result of the purchase and use of PrimeTrim. The record is replete with representations by GP as to the quality and durability of the PrimeTrim, via advertisement, the express warranty, and the installation instructions. Indeed, GP essentially concedes Parker's injury-in-fact by arguing that the CFA claim is subsumed by the PLA due to the suffering of consequential damages. Whether or not Parker will need to amend the pleading pursuant to Rule 15(a) to identify an adequate subclass representative is a question for another day. Resolution of the class certification issue "is logically antecedent to the existence of Article III issues, [thus] it is appropriate to reach them first." <u>Amchem Prods v. Windsor</u>, 521 U.S. 591, 612-13 (1997). The Supreme Court has "follow[ed] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these [standing] issues because they would not exist but for the [class action] certification." <u>Id.</u>

### c. The pleading standards are met as to affirmative acts, knowing misrepresentations and unconscionable commercial practices, and are not met as to regulatory violations.

Next, GP challenges Parker's ability to meet the heightened pleading standards to assert the CFA claim – in so much as it is based on fraud – with particularity pursuant to Fed. R. Civ. P. 9 as a matter of law. Rule 9(b) requires that Plaintiffs set forth the particular factual

circumstances constituting the fraud. Fed. R. Civ. P. 9(b). As to the CFA claims which are not premised on fraud, GP argues that Parker has not met the Iqbal standards to state a plausible claim to relief.

Again, the CFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]" N.J.S.A. § 56:8-2.

To state a claim under the CFA, Parker must allege sufficient facts to demonstrate: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 389-391 (2007) (hereinafter "IUOEL"). "[The] CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover. In place of the traditional reliance element of fraud and misrepresentation, we have required that plaintiffs demonstrate that they have sustained an ascertainable loss." Id. Unlawful conduct under the Act falls into three general categories: affirmative acts and knowing omissions, see N.J.S.A. 56:8-2, supra, and violations of regulations promulgated under the Act, see N.J.S.A. 56:8-4, infra. See also Cox v. Sears Roebuck & Co., 138 N.J. 2, 17-18 (1994). The Act is "remedial legislation which should be construed liberally." IOUEL, 929 A.2d at 1079 n. 1.

**i. Affirmative Acts**

GP argues that "the Amended Complaint does not allege with specificity, as required by Rule 9(b) and *Iqbal*, that any misrepresentations were made to Plaintiff directly or that Plaintiff was otherwise ever exposed *in any way* to any representation whatsoever by Georgia-Pacific." (MTD Br. at 18.). Specifically, GP contends that no misrepresentations were made to Parker because the representations were made only to builders, subcontractors, and agents, and not directly to Parker. However, Parker clarifies that "the allegations upon which Defendants do choose to focus concerning misrepresentations made by Defendants to builders and others are not the crux of Plaintiff's CFA claim. Instead, these are factual allegations establishing why Defendants' Trim Board was defective and could not perform as represented by Defendants' warranty furnished to Plaintiff and as known by Defendants when making the warranty misrepresentations to Plaintiff." (MTD Opp. Br. at 16.) Indeed, Parker takes issue with GP's misrepresentations within the 30-year express warranty, *supra* at 6, which was provided to Parker and other members of the class. The express warranty is also included in Exhibit A to the First Amended Complaint.

"[T]he law does not require specificity just for specificity's sake. The level of particularity required is sufficient details to put Defendants on notice of the 'precise misconduct with which they are charged.'" Smajlaj, et al. v. Campbell Soup Co., 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting Franulovic v. Coca-Cola Co., 07-539, 2007 U.S. Dist. LEXIS 79732, *11 (D.N.J. Oct. 25, 2007)). In other words, "[t]o satisfy the specificity requirement of Fed. R. Civ. P. 9(b) the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." Id. (relying on Abersky v. Bed Bath & Beyond, Inc., 06-1735, 2006 U.S. Dist. LEXIS 86451, *4 (D.N.J. Nov. 29, 2006)). See also In re

<u>Toshiba America HD DVD Marketing and Sales Practices Litigation</u>, 08-939 (DRD), 2009 U.S. Dist. LEXIS 82833, *13 (D.N.J. Sept. 11, 2009) (finding insufficient particularity because the plaintiffs failed to allege where and when they made purchases, how much they paid, how much the product they received was worth, when misrepresentations were, and when the plaintiffs were exposed to them). GP's reliance on <u>Jatras v. Bank of Am. Corp. et al.</u>, 09-3107, 2010 U.S. Dist. LEXIS 135815, *22 (Dec. 23, 2010) is unpersuasive because the facts there related to lack of proximate cause for losses stemming from a CFA misrepresentation claim where the defendant "merely lent Plaintiffs the money to pay for the property which Plaintiffs contracted for." The jurisprudence considered above regarding CFA challenges in direct supply chain dynamics is more appropriate here.

The pleadings are set forth with particularity because GP is on notice of the basis of the CFA claim: the challenged representations include those provided in the thirty-year express warranty in the larger context of the affirmation of the quality of the product in advertisement and marketing; the express warranty is provided to each purchaser; the lack of quality and durability of the product was revealed in internal acknowledgement by technical personnel and senior sales personnel; consumers could be misled and complaints were expected to increase; and dramatic improvements to decay resistance was possible using various percentages of zinc borate, as was used by competitors on the market, but these suggestions for product-improvement were rejected by GP management. The allegations also include the address of Parker's memorial home at issue, and the date on which it made the warranty claim, and the date when the structure was investigated pursuant to the warranty claim.[7]

---

[7] Parker emphasizes that the representations provided in the express warranty as "the crux" of its basis of the CFA claim (MTD Opp. Br. at 16). Therefore, the Court need not reach here whether lack of privity with regard to the builders, constructors, or agents, would render the right to consumer protection obsolete based on representations outside of the express warranty. The

## ii.    Knowing Omissions

GP argues that Parker "does not allege that Georgia-Pacific made some prior statement to Plaintiff that required correction." (MTD Br. at 20.)  In support of this contention, GP argues that Parker has not alleged that it was ever exposed in any way to a statement made related to PrimeTrim; cannot allege a fiduciary relationship with GP; and that any such allegations are implausible under the facts because Parker did not purchase PrimeTrim from GP.

An omission occurs where the defendant (1) knowingly concealed (2) a material fact, (3) with the intention that the consumer rely upon the concealment. Judge v. Blackfin Yacht Corp., 815 A.3d 537 (N.J. Super. App. Div.), cert. den., 176 N.J. 428 (2003), (citing Feinberg v. Red Bank Volvo, Inc., 752 A.2d 720 (N.J. Super. App. Div. 2000)).  Again, unlike common law fraud, which requires allegations that the plaintiff relied on the defendant's misrepresentations or omissions, the CFA does not require a plaintiff to demonstrate that he actually relied upon any misrepresentation or omission. See IUOE, supra, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on the prohibited act in order to recover.")  Instead, the CFA requires merely a causal nexus between the unlawful act and the ascertainable loss. Id.  GP argues that Parker never explains why GP owes it a duty of disclosure.  However, New Jersey law is clear that a duty to disclose is implied where such disclosure is necessary to make a previous statement true.  See e.g., Lightning Lube v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993).

---

Court notes, however, that the CFA explicitly covers "direct" and "indirect" acts under the definitions of both unlawful "advertisement" and "sale." N.J.S.A. § 56:8-1(a); (3). See also Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co., 226 N.J. Super. 200 (App.Div. 1988), aff'd, 118 N.J. 249 (1990) (affirming the CFA's coverage of "acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer").

The Amended Complaint clearly sets forth the specific conduct regarding knowing

material omissions of the product's quality and durability over a specific period of time as a

matter of law, and the associated ascertainable loss.  The Amended Complaint clearly alleges the

defective nature of the PrimeTrim and that GP knew of the defect and failed to disclose it, and

that as early as 1998, GP's senior sales personnel, over GP's own technical personnel's

objections, actively sought to conceal these facts, continued to advertise to the contrary, and

intentionally opted not to adopt available product improvements known to be effective, solely

due to cost. (Am. Compl. ¶¶ 96-105.)  These alleged misrepresentations are evidenced in the

thirty-year express warranty as well.  Parker has met the pleading standards and GP is clearly on

notice of the claim as a matter of law such that the challenge may proceed.

### iii.    Unconscionable Commercial Practices

Next, GP argues that the conduct here does not qualify as an unconscionable commercial

practice, which is only one of the forbidden types of acts listed under N.J.S.A. § 56:8-2, *supra* at

18-19, in addition to fraud, deception, or misrepresentation.  To be sure, proof of any one of the

acts or omissions forbidden by the CFA is sufficient to establish unlawful conduct.  With respect

to whether the misconduct rises to the level of an unconscionable commercial practice, the New

Jersey Supreme Court noted that "unconscionability is 'an amorphous concept obviously

designed to establish a broad business ethic." Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (N.J.

1994) (quoting Kugler v. Romain, 58 N.J. 522 (1971)).

> The standard of conduct that the term "unconscionable" implies is
> lack of "good faith, honesty in fact and observance of fair dealing."
> Id. at 544, 279 A.2d 640. However, "a breach of warranty, or any
> breach of contract, is not per se unfair or unconscionable * * * and
> a breach of warranty alone does not violate a consumer protection
> statute." D'Ercole Sales, supra, 206 N.J. Super. at 25, 501 A.2d
> 990. Because any breach of warranty or contract is unfair to the
> non-breaching party, the law permits that party to recoup remedial

> damages in an action on the contract; however, by providing that a
> court should treble those damages and should award attorneys' fees
> and costs, the Legislature must have intended that substantial
> aggravating circumstances be present in addition to the breach.
> DiNicola v. Watchung Furniture's Country Manor, 232 N.J. Super.
> 69, 72, 556 A.2d 367 (App.Div.) (finding that breach of warranty
> in supplying defective furniture and denying that defect existed
> was not unconscionable), certif. denied, 117 N.J. 126, 504 A.2d
> 854 (1989); D'Ercole Sales, supra, 206 N.J. Super. at 31, 501 A.2d
> 990 (holding that breach of warranty for malfunctioning tow truck
> and refusal to repair was not unconscionable practice).

Id. at 18. Cox relies in part on the reasoning set forth by the state appellate court in D'Ercole

Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 29 (App. Div. 1985), to evaluate the presence of

unconscionability. See also N.J. MODEL JURY INSTRUCTIONS , § 4.43, n. 4 (Consumer Fraud Act)

(rev. 2011) (similarly pointing to D'Ercole).

D'Ercole provides that a violation under the Uniform Consumer Sales Practice Act

(USCPSA) 7A U.LA. 231 et seq., is "particularly analogous to the New Jersey Consumer Fraud Act

because the norm for violation of the USCPSA is 'an unconscionable act or practice.' Further, a

violation may occur before, during or after the transaction." D'Ercole, 206 N.J. Super. at 29

(quoting §4(a) of the USCPSA). According to Section 4(b), "[t]he unconscionability of an act or

practice is a question of law for the court. If it is claimed or appears to the court that an act or

practice may be unconscionable, the parties shall be given a reasonable opportunity to present

evidence as to its setting, purpose, and effect to aid the court in making its determination."

> Subsection 4(c) sets forth a certain criteria to assist the court in
> determining unconscionability:
>
> (c) in determining whether an act or practice is unconscionable, the
> court shall consider circumstances such as the following of which
> the supplier knew or had reason to know:
>
> (1) that he took advantage of the inability of the consumer
> reasonably to protect his interests because of his physical infirmity,
> ignorance, illiteracy, inability to understand the language of an

agreement, or similar factors;

(2) that when the consumer transaction was entered into the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers;

(3) that when the consumer transaction was entered into the consumer was unable to receive a substantial benefit from the subject of the transaction;

(4) that when the consumer transaction was entered into there was no reasonable probability of payment of the obligation in full by the consumer,

(5) that the transaction he induced the consumer to enter into was excessively one-sided in favor of the supplier; or

(6) that he made a misleading statement of opinion on which the consumer was likely to rely to his detriment.

Id. at 29-30.

The parties ask the Court to pass judgment on whether the conduct alleged, including the refusal to uphold the warranty, is an unconscionable commercial practice as a matter of law. However, discovery in this case is forthcoming. It is not clear, for example, how prolific the deterioration is to the CFA class such that the price paid "grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers." Id. (quoting USCPSA § 4(c)(2)), and/or how prolific alleged illegitimate refusals to honor the warranties are. Because "[a] court adjudicating a CFA claim must approach dismissal of said claim 'with hesitation,'" Parker v. Howmedica Osteonics Corp., 07-02400, 2008 U.S. Dist. LEXIS 2570, *2 (D.N.J. Jan. 14, 2008) (quoting New Jersey Citizen Action v. Schering-Plough Corp., 842 A.2d 174, 177 (N.J. Super. Ct. App. Div. 2003)), the Court denies GP's motion to dismiss the

CFA claim for unconscionable consumer practices with leave to renew the argument upon summary judgment.[8]

### iv.    Regulatory Violation

The categorization of a regulatory violation as unlawful conduct under the CFA finds support in N.J.S.A. § 56:8-4 (Additional powers), which empowers the Attorney General to carry out the objectives and duties prescribed by the CPA, including via promulgation of rules and regulations as may be necessary:

> To accomplish the objectives and to carry out the duties prescribed by this act, the Attorney General, in addition to other powers conferred upon him by this act, may issue subpoenas to any person, administer an oath or affirmation to any person, conduct hearings in aid of any investigation or inquiry, promulgate such rules and regulations, and prescribe such forms as may be necessary, which shall have the force of law.

N.J.S.A. § 56:8-4.

Consistent with the foregoing authority, the Division of Consumer Affairs has enacted an array of such regulations governing numerous practices. See N.J.S.A. § 56:8-2.32 (Regulations) ("The Director of the Division of Consumer Affairs in the Department of Law and Public Safety may promulgate regulations pursuant to the 'Administrative Procedure Act,' P.L. 1968, c.410 (C.52:14B-1 et seq.) to effectuate the provisions of this act."). For example, Chapter 45A (Administrative Rules of the Division of Consumer Affairs) of Title 13 (Law and Public Safety) includes 34 subchapters of such regulations, including subchapter 16, regarding home improvement practices. See NJAC § 13:45A-16.

---

[8]     See also Dewey, et al. v. Volkswagen AG, et al., 558 F. Supp. 2d 505 (D.N.J. 2008) (denying the motion to dismiss the CFA claim for unconscionable commercial practices with leave to Defendant to renew the argument at the summary judgment phase because neither parties had briefed whether the plaintiff adequately plead "substantial aggravating circumstances.").

As the New Jersey Supreme Court has explained, in instances of "violations of specific regulations promulgated under the [Consumer Fraud] Act . . . the regulations impose strict liability for such violations." Cox, 138 N.J. at 17. "The parties subject to the regulations are assumed to be familiar with them, so that any violation of the regulations, regardless of intent or moral culpability, constitutes a violation of the Act." Id.

However, the "[CFA-promulgated] regulations are not meant to be exhaustive, and practices not specified in the regulations may nevertheless constitute unlawful consumer fraud." Cox, 138 N.J. at 16-17 (referencing N.J.A.C. § 13:45A-16.2(a)). Indeed, The CFA is a cumulative remedy:

> The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State, and nothing contained herein shall be construed to deny, abrogate or impair any such common law or statutory right, remedy or prohibition.

> N.J.S.A. § 56:8-2.13

Additionally, N.J.S.A. § 56:8-19 provides: "In any action under this section the court shall, *in addition to any other appropriate legal or equitable relief,* award threefold the damages sustained by any person in interest." N.J.S.A. § 56:8-19 (emphasis added).

GP contends that, consistent with the CFA's authorization of the Attorney General to promulgate regulations pursuant to the CFA, "the Division of Consumer Affairs has enacted an array of such regulations governing numerous practices susceptible to false advertising and consumer fraud violations, including things like: automotive sales and repairs; deceptive mail order practices; servicing and repairing of home appliances; home improvement practices; watercraft repair; toy and bicycle safety; and meat sales. However, none of them apply to the facts of this case." (MTD Reply Br. at 22.) See N.J.A.C. § 13:45A *et seq.*

Rather than argue for applicability of regulations promulgated under the CFA such as the Home Improvement Practices regulations briefly referenced above, Parker argues that certain regulations not promulgated under the CFA – in particular the Uniform Construction Code, N.J.A.C. § 5:23 ("Construction Code") – are actionable under the CFA based on the facts here. Specifically, Parker argues that GP's conduct is per se unlawful under the CFA because it violated subcodes of the Construction Code: the 2000 International Building Code (NJAC 5:23-3.14) ("building subcode"), the 2002 New Jersey Residential Code (NJAC 5:23-3.21) ("construction subcode"), and the Municipal approvals of alternative materials, equipment, or methods of construction code (5:23-3.7(a)(1); (b)) ("municipal approvals subcode").

Parker purports that these subcodes are applicable to the structures of Plaintiff and class members. (See Am. Compl. ¶ 118.) Parker contends that GP violated the subcodes "because GP did not get adequate approval from a subcode official prior to selling PrimeTrim to be installed. Further, it offered PrimeTrim to be sold and installed on structures when it violated the building code because it knew or should have known that the PrimeTrim was inherently defective and was not suitable as an exterior trim product. The intent of the CFA and the building codes is to protect consumers and make sure that the products marketed and sold to be installed on homes and structures are in full compliance with the applicable building codes." (MTD Opp. Br. at 25.)

To be sure, the New Jersey appellate courts have found CFA claims actionable when they are premised on violations of statutes and regulations either directly promulgated under the CFA or independent of the CFA where the conduct evidences unconscionable commercial practice. Compare e.g., Sprenger v. Trout, 375 N.J. Super. 120, 131 (N.J. Super. Ct. App. Div. 2005) (CFA applies to regulation promulgated under CFA, specifically N.J.A.C. § 13:34A-26c.1, regarding violation of auto-repair regulations designed to prevent a situation where the consumer

is presented with a final bill that far exceeds the anticipated cost of repairs); Cybul v. Atrium Palace Syndicate, 272 N.J. Super. 330, 336 (N.J. Super. Ct. App. Div. 1994) (CFA applies to regulations promulgated under CFA pertinent to the Construction Code, specifically N.J.A.C. § 5:23-2.23, where a defendant's insistence on closing title to a condominium without a certificate of occupancy is a violation of the Construction Code and is conduct "susceptible to a finding of unconscionable practices within the intendment of the Consumer Fraud Act."); with Lemelledo v. Beneficial Mgmt. Corp., 289 N.J. Super. 489, 493, 502 (N.J. Super. Ct. App. Div. 1996) (regulations promulgated independent of the CFA under the Consumer Loan Act, N.J.S.A. § 17:10-1 to -21, regarding advertisement of loans, could be used to prove fraudulent and unconscionable conduct prohibited by the CFA because both statutes are cumulative.)

Unfortunately, GP provides no explanation as to why these cases, also referenced by Parker, are inapplicable here. Nor does GP provide any statutory interpretation as to why the subcodes are irrelevant. GP simply summarily argues that the building code provisions are inapplicable because the Construction Code does not impose an obligation on GP as a remote product manufacturer. Neither party has offered any case which is directly on point.

It is clear that a violation of the Construction Code *in and of itself* is not actionable under the CFA. See e.g., Nickerson v. Quaker Group, A-6253-06T5, 2008 N.J. Super. Unpub. LEXIS 242 (N.J. Super. Ct. App.Div. July 3, 2008) (the CFA claim is not actionable where the regulation promulgated under its purview addressed only home improvement contracts and not new home sales at issue therein, and where the record did not evidence "the direct and unfair compulsion of consumer acquiescence in a manner that a regulation specifically prohibited"). Rather, the question the Court is presented with is if the violation of the Construction Code,

premised on unconscionable commercial conduct such as deceptive or coercive practices, is actionable under the CFA based on the law and record here.

The Construction Code "control[s] all matters concerning the construction, alteration, addition, repair, removal, demolition, use, location and occupancy of all buildings and structures[.]" N.J.A.C. § 5:23-2.1(c). GP focuses on this point and argues that "[i]t is undisputed that Georgia-Pacific did not engage in any of these activities with respect to the Stonegate Facility. Nothing in the Construction Code provisions cited by Plaintiff imposes any obligation on a remote product manufacturer, like Georgia-Pacific, that has no involvement in the construction of, and does own, the building at issue." (MTD Br. at 22.) GP thus argues that "[a] statute that imposes no obligation on Georgia-Pacific obviously cannot be the basis for liability under the CFA." (Id.) However, a plain reading of the statute does not necessarily suggest that GP is absolved here, for it is alleged that GP placed items in the stream of commerce which it knew and misrepresented as adequate for their ordinary intended use. The alleged conduct is arguably in the ambit of this section which by its own terms "control[s] *all* matters" concerning the construction, alteration, and repair of "all buildings and structures[.]" N.J.A.C. § 5:23-2.1(c)(emphasis added). Moreover, N.J.A.C. § 5:23-2.1(d) also provides that "[t]he regulations shall be construed to secure its express intent, which is to insure public safety, health and welfare insofar as they are affected by building construction, through *structural strength*, adequate egress facilities, light and ventilation, and fire safety; and, in general, *to secure safety to life and property from all hazards incident to* the design, erection, repair, removal, demolition or use and occupancy of buildings, structures or premises."

The Court lists each subcode as it is very hastily alleged by Parker below.

i. **Building Subcode, N.J.A.C. § 5:23-3.14**

Parker looks to Section 1405.1 of the 2000 IBC which states that "[e]xterior wall coverings shall be designed and constructed in accordance with the applicable provisions of this section." (Am. Compl. ¶ 120). Parker notes that "[t]here is, however, no applicable provision in the IBC regarding the installation or manufacture of PrimeTrim." (Am. Compl. ¶ 121.) However, N.J.A.C. § 5:23-3.14 does not include this language therein, and it is the statutory adoption and modification of the 2009 International Building Code. The vague and general assertions of violations of the building subcode found in Parker's opposition to the motion to dismiss, without reference to more specific statutory construction, are inadequate. Parker goes to great lengths to explain the liberal construction of the CFA, but largely fails to address any statutory interpretation of the Construction Code. The motion to dismiss the alleged violation of the building subcode as a regulatory violation of the CFA is therefore granted.

### ii. Construction Subcode, N.J.A.C. § 5:23-3.21

Next, Parker relies on Section R701.1 of the New Jersey Residential Code, which states that "[t]he provisions of this chapter shall control the design and construction of the interior and exterior wall coverings for all buildings." Parker notes that "[t]here is, however no applicable provision in the NJRC regarding the installation or manufacture of PrimeTrim." (Am. Compl. ¶¶ 122, 123.) However, N.J.A.C. § 5:23-3.21 does not include this language therein, and it is the statutory adoption and modification of the New Jersey Residential Code. Again, the vague and general assertions to violations of the construction subcode found in Parker's opposition to the motion to dismiss, without reference to more specific statutory construction, are inadequate. The motion to dismiss the alleged violation of the construction subcode as a regulatory violation of the CFA is therefore granted.

### iii. Municipal Approvals Subcode, N.J.A.C. § 5:23-3.7(a)(1)

Last, Parker looks to N.J.A.C. § 5:23-3.7 ("Municipal approvals of alternative materials, equipment, or methods of construction"):

> Alternative materials, equipment, or methods of construction shall be approved by the appropriate subcode official provided the proposed design is satisfactory and that the materials, equipment, or methods of construction are suitable for the intended use and are at least the equivalent in quality, strength, effectiveness, fire resistance, durability and safety of those conforming with the requirements of the regulations.
>
> 1. A field evaluation label and report or letter issued by a nationally recognized testing laboratory verifying that the specific material, equipment, or method of construction meets the identified standards or has been tested and found to be suitable for the intended use, shall be accepted by the appropriate subcode official as meeting the requirements of (a) above.
> 2. Reports of engineering findings issued by nationally recognized evaluation service programs, such as, but not limited to, the Building Officials and Code Administrators (BOCA), the International Conference of Building Officials (ICBO), the Southern Building Code Congress International (SBCCI), the International Code Council (ICC), and the National Evaluation Service, Inc., shall be accepted by the appropriate subcode official as meeting the requirements of (a) above. The materials, equipment, or assembly shall be installed in accordance with the conditions specified in the report.
>
> NJAC 5:23-3.7(a).

Section 5:23-3.7(b) further sets forth:

> Research and investigations: The appropriate subcode official shall require that sufficient technical data be submitted to substantiate the proposed use of any material or assembly, and if it is determined that the evidence submitted is satisfactory proof of performance for the use intended, he may approve its use subject to the requirements of the regulations. The cost of all tests, reports and investigations required under these provisions shall be paid by the applicant.

Parker alleges that "upon information and belief, GP did not get approval from a subcode official to install PrimeTrim on homes." (Am. Compl. ¶ 126.) "Even though GP provided purchasers and homeowners with an express warranty, GP was charged by law as a matter of public policy with the duty to comply with all applicable building codes for products installed on homes." (Am. Compl. ¶ 128.)

Again, Parker has not provided any statutory construction to indicate, beyond matters of public policy, how the Construction Code can be interpreted to apply to GP. Again, while Parker focuses in its opposition brief on the liberal interpretation of the CFA, it largely curtails discussion altogether as to any breadth of the Construction Code. For the foregoing reasons, GP's dismissal of the CFA claim insofar it is raised based on regulatory violations is granted.

## 2. Declaratory Judgment (Count VI)

In Count VI for Declaratory Relief, Parker seeks a final injunctive relief or corresponding declaratory relief as to the Class within the meaning of Fed. R. Civ. P. 23, that a) the PrimeTrim has a defect which results in premature failure; b) GP's warranty fails of its essential purpose; c) Certain provisions of the warranty are void as unconscionable; d) GP must notify owners of the defect; e) GP will reassess all prior warranty claims and pay the full costs of repairs and damages; and f) GP will pay the costs of inspection to determine whether any Class member's PrimeTrim needs replacement.

GP moves to dismiss Count VI for Declaratory Relief on the grounds that there is no independently actionable claim present such as the CFA or the PLA; that these statutes do not provide a substantive right to declaratory relief that could give rise to a Rule 23(b)(2) class; and because the Rule 23(b)(2) subclass fails because the relief sought is not applicable to all class members. The motion to dismiss the count is premature, as it is best addressed upon a motion to

certify the class after the completion of discovery. Moreover, the Court notes that it has wide discretion to provide declaratory relief, independent of its provision via Rule 23(b)(2) classification.

### 3. Express Warranty (Count II)

Finally, GP moves to limit the claim arising under Count II, Parker's Express Warranty claim, to an Express Limited Warranty claim. GP argues that "[a]lthough the Amended Complaint mentions other purported representations from Georgia-Pacific, (*id.* ¶ 34), those representations are not alleged as part of Count II. Even if they were, however, Plaintiff has not pled the statements with sufficient detail to give rise to an actionable 'express warranty' claim." (MTD Br. at 26.) GP's argument on this point is unpersuasive.

The first paragraph in Count II explicitly "adopts and incorporates by reference all allegations contained in paragraphs 1 through 62 as fully set forth herein." (Am. Compl. ¶ 75.) Those preceding paragraphs clearly delineate specific representations made in marketing materials and advertisements (id. at ¶ 34), and guarantees as to the quality and durability of the product in GP's thirty-year warranty (id. at ¶ 40-46) and in its installation instructions ((id. at ¶48). The record is replete with specific factual representations, including but not limited to: that PrimeTrim could be installed wherever non-structural wood trim can be used and has none of the normal defects found in lumber such as knots, splits, checks and wane (Am. Compl. ¶ 32); that PrimeTrim offers up to four times more decay resistance than lumber (id. at 34); that PrimeTrim "[f]eatures superior moisture and decay resistance" (id.); and that it "may be installed *wherever* non-structural wood trim can be used (id. at 46); and that "PrimeTrim is intended for use as fascia, rake board, corner board, shingle mould, bandboard, baseboard, soffit, or *anywhere* defect-free, non-structural trim lumber is required" (id.).

Moreover, the second paragraph of Count II directly points to factual statements provided "[a]s set forth in Exhibit A" in the warranty, that the product was appropriate for its intended use, "wherever non-structural wood trim can be used"; "anywhere defect-free, nonstructural trim lumber is required"; "where any high-quality non-structural trim lumber is required", and "is free of defects in materials and workmanship." (Am. Compl. ¶ 76; Ex. A.)

Next, GP contends that Parker cannot allege that the representations became part of the "basis of the bargain" as required by N.J.S.A. 12A:2-313(1)(a) because the representations were made to third parties and Parker cannot allege that it "'read, heard, saw or knew of' any affirmation of fact by GP." (MTD Reply Br. at 11, quoting Cipollone v. Liggett Group, Inc., 893 F.2d 541, 567-68 (3d Cir. 1990), overruled on other grounds, 505 U.S. 504 (1992).) It should be noted that GP does little to assert the basis for its motion to limit the claim, as only one paragraph is dedicated to its arguments in each the initial and the reply brief.

According to N.J.S.A. 12A:2-313 (Express warranties by affirmation, promise, description, sample):

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation

merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

The Official Comments in this Section, further state:

> The present section deals with affirmations of fact by the seller, descriptions of the goods or exhibitions of samples, exactly as any other part of a negotiation which ends in a contract is dealt with. No specific intention to make a warranty is necessary if any of these factors is made part of the basis of the bargain. In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is *one of fact.*

N.J.S.A. 12A:2-313, Cmt. 3 (emphasis added).

Thus, under New Jersey law, in order to state a claim for breach of express warranty, Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description. Arlandson v. Hartz Mt. Corp., 792 F. Supp. 691, 706 (D.N.J. 2011); referencing New Hope Pipe Liners, 2009 U.S. Dist. LEXIS 111217, at *15; N.J. Stat. Ann. § 12A:2-313. Notably, the courts have instructed, consistent with Comment 3 of the Official Comments of the pertinent section, that "whether a given statement constitutes an express warranty is normally a question of fact for the jury." Id. (quoting In re Ford Motor Co. E-350 Van Prods. Liab. Litig., 03-4558, 2008 U.S. Dist. LEXIS 73690 (D.N.J. Sept. 3, 2008); Union Ink Co., Inc. v. AT&T Corp., 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact")). In Arlandson, the Court

did not need to reach the issue of whether the representations were the basis of the bargain because it found that the representations therein were general and not factually specific as to the product quality. 792 F. Supp. at 706. The specificity of the challenged representations is distinctly different here, and GP is sufficiently put on notice as to them to defeat dismissal of the motion as a matter of law with respect to the pleadings.

First, the Court is presented with the question of whether manufacturer-liability is available when the purchaser holds a warranty from the manufacturer, but did not purchase the item directly from the manufacturer. In anticipation of GP's argument that a lack of privity applies here between GP and Parker or the class members, Parker looks to the reasoning provided by the state appellate court in Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 64 (N.J. Super. Ct. App. Div. 1981) and the New Jersey Supreme Court in Spring Motors Distribs v. Ford Motor Co., 98 N.J. 555, 561, 589 (1985). Indeed, Parker was correct to anticipate the lack of privity argument, as GP contends that "Plaintiff says that it can rest its claim on representations allegedly made by Georgia-Pacific *to unidentified third parties*. However, Plaintiff cites no authority for this novel proposition and the Amended Complaint contains no plausible allegation that any such representations were communicated to Plaintiff." (MTD Reply Br. at 11.)

In Ventura, the court appellate court addressed the question of privity and whether a purchaser could recover directly from the manufacturer for breach of the manufacturer's warranty due to product defect as a matter of New Jersey law. The court found in favor of manufacturer liability, even where the product is not purchased directly from the manufacturer. The court reasoned:

> We are dealing with the breach of an express contractual
> obligation. Nothing prevents us from granting an adequate remedy

under state law for that breach of contract, including rescission when appropriate. Under state law the right to revoke acceptance for defects substantially impairing the value of the product (*N.J.S.A. 12A:2-608*) and to receive a refund of the purchase price (*N.J.S.A. 12A:2-711*) are rights available to a buyer against a seller in privity. Where the manufacturer gives a warranty to induce the sale it is consistent to allow the same type of remedy as against that manufacturer. *See Durfee v. Rod Baxter Imports, Inc., supra; cf. Seely v. White Motor Co., supra.* Only the privity concept, which is frequently viewed as a relic these days, *Koperski v. Husker Dodge, Inc., 208 Neb. 29, 45, 302 N.W.2d 655, 664 (Sup.Ct.1981); see Kinlaw v. Long Mfg. N.C., Inc., 298 N.C. 494, 259 S.E.2d 552 (Sup.Ct.1979),* has interfered with a rescission-type remedy against the manufacturer of goods not purchased directly from the manufacturer. If we focus on the fact that the warranty creates a direct contractual obligation to the buyer, the reason for allowing the same remedy that is available against a direct seller becomes clear.

Id. (emphasis added).

Manufacturer-liability due to a breach of warranty has also been established when the claim is for economic losses only, even where the product was not purchased directly from the manufacturer. See Spring Motors Distribs v. Ford Motor Co., 98 N.J. 555, 561, 589 (1985) ("We hold that the buyer need not establish privity with the remote supplier to maintain an action for breach of express or implied warranties") ("[A] commercial buyer in a distributive chain may maintain an action under the U.C.C. for purely economic loss arising out of a breach of warranty by a remote supplier."). Here, it is alleged that Parker and the class members receive manufacturer-provided warranties upon purchase of PrimeTrim. In accordance with New Jersey law, manufacturer-liability applies as to the independent claims based in contract and tort based on the terms of the manufacturer-provided warranty.

Second, GP looks to a decision reached by the Third Circuit Court of Appeals, Cipollone v. Liggett Group, Inc., 893 F.2d 541, 567-68 (3d Cir. 1990), overruled on other grounds, 505 U.S. 504 (1992), in support if its contention that the claim should be limited from an Express

Warranty claim to an Express Limited Warranty claim because Parker has not asserted that it has "'read, heard, saw or knew of' any affirmation of fact by GP." Unfortunately, Parker has not attempted to address GP's reliance on Cipollone, and the parties seem to talk past each other yet again. Cipollone is informative as to the construction of N.J.S.A. § 12A:2-313, especially with respect to various parts in the Official Comments of the Section, and the tension between the statutory language that the representations be the "basis of the bargain" and the principle that reliance need not be shown.

Following an examination of the statutory and judicial interpretation on this tension and the burdens it imposes, Cipollone concluded: "the New Jersey Supreme Court would hold that a plaintiff effectuates the 'basis of the bargain' requirement of *section 2-313* by proving that she read, heard, saw or knew of the advertisement containing the affirmation of fact or promise.[29]" Id. at 567-568. Importantly, footnote 29 associated with that holding explicitly emphasizes that it does not apply when the case involves a written warranty. Id., n. 29 ("The burden that we place on the plaintiff stems in part from the fact that this case involves neither a written warranty delivered to the purchaser in connection with a sale nor an oral affirmation of fact or promise made to the purchaser in person by the seller. In both of those situations *there is no question that the plaintiff has knowledge that the alleged warranty exists*.") (emphasis added). GP conveniently overlooks this explicit limitation in Cipollone and does not attempt to discern it to the facts here, and it is the only illustrative case on which GP relies. GP's motion to limit the claim is therefore denied because it is undisputed that Parker and the proposed class members received an express warranty upon purchase of PrimeTrim. GP is sufficiently put on notice as to the misrepresentations at issue, which include at a minimum the warranty. Discovery may provide factual information relevant to further analysis of this issue.

## III. CONCLUSION

For the foregoing reasons, GP's motion to dismiss Count III for violation of the Consumer Fraud Act is DENIED because the claim is not subsumed by the Product Liability Act; the standing challenge is premature; and the pleading standards have been met to assert the claim on the basis of affirmative acts and knowing misrepresentations. As to availability of the CFA claim to assert unconscionable commercial practices, the motion to dismiss is DENIED with leave to renew the argument upon summary judgment. GP's motion to dismiss Count III for violation of the Consumer Fraud Act as to misconduct arising from regulatory violations related to the Building Code is GRANTED.

GP's motion to dismiss Count VI for declaratory judgment is DENIED.

GP's motion to dismiss claims available pursuant to Count II for the express warranty claim is DENIED.

The Court will enter an order implementing this opinion.

DICKINSON R. DEBEVOISE, U.S.S.D.J.

**Dated:** May _20_ , 2013